(8 App. Div. 201)

## PEOPLE ex rel. WASHINGTON MILLS CO. v. ROBERTS, Comptroller.

(Supreme Court, Appellate Division, Third Department. July 7, 1896.)

TAXATION—FOREIGN CORPORATION DOING BUSINESS IN NEW YORK.

A Massachusetts corporation, whose factory and principal office were in that state, leased an office in New York City, where samples were kept and distributed to traveling salesmen. About 20 employés received their pay at such office. The corporation, every month, sent from the home office, in Boston, $4,000, to the agent in charge of the New York office, which the agent deposited in bank in his own name, "as agent," and drew checks on it for the expenses of the office. The average monthly balance did not exceed $500, and there were always enough outstanding liabilities to exhaust such balance. No goods were kept for sale at the New York office, but only samples, which, after having served their purpose, were sold as old rags. All orders for goods were sent to the home office, whence the goods were shipped directly to the purchaser. *Held,* that the corporation did not employ any of its capital stock in New York, within Laws 1890, c. 522, § 3, relating to the taxation of foreign corporations.

Certiorari by the Washington Mills Company to review the determination of James A. Roberts, as comptroller of the state of New York, in assessing relator as a foreign corporation doing business in New York. Reversed.

Argued before PARKER, P. J., and LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

Strong & Cadwalader, for relator.

T. E. Hancock, Atty. Gen., for comptroller.

PARKER, P. J. The relator is a foreign corporation organized under the laws of Massachusetts. It has a capital stock of $2,500,000, and is engaged in manufacturing woolen cloths at its mills, in Lawrence, in such state. Its principal office is in Boston. It rents part of a building in New York City, at which is an office in charge of a selling agent, and at which are kept and distributed to a number of traveling agents, and to customers, samples of its goods. About 20 employés, including the traveling salesmen, are paid at this office. For the purpose of meeting such expenses, for paying the rent of rooms, which is about $8,000 per annum, and for all other incidental expenses, about $4,000 each month is sent to such sales agent by the treasurer, from the home office, in Boston. Such moneys the agent deposits in his own name, "as agent," in a bank in New York City, and applies it, by his checks, to the payment of the company's monthly expenses. The average monthly balance left in bank does not exceed $500, and against that balance there is always existing an outstanding indebtedness in New York City that would exhaust it. At this office in New York City orders are taken for the company's goods;

also, the salesmen throughout this state, and from some others, send orders for such goods to the agent at the New York office. All such orders, however, are sent by such agent to the treasurer, in Boston, for his approval or disapproval; and all goods sold under such orders are shipped from Boston, or the mills, direct to the purchaser. Only goods to be used as samples are shipped to the New York office. No goods whatever are kept for sale in the city of New York. Such of the goods as are there kept for samples are cut into small pieces, which are worthless as merchandise, and when they have served their purpose as samples they are sold for old rags. There have been some instances when goods ordered by purchasers in New York City, and shipped to them from Boston, have been rejected by the purchasers; and some where the purchaser has become pecuniarily irresponsible, and therefore unable to take them. In those cases such goods have been retained a short time at the rooms in New York, awaiting a resale, or a return to the mills, and instructions from the treasurer. But these instances have been infrequent, and it is very plain that it has never been the custom or intent of the relator to keep goods for sale at its said rooms in New York.

Upon these facts the comptroller determined that the relator was doing business within this state, and that it employed upwards of $27,000 of its capital stock in this state, and assessed against it the amount of tax and penalty required by the statute. In this conclusion, we think, the comptroller erred. Without reference to the question whether the relator was doing business in this state, within the meaning of section 3, c. 522, Laws 1890, such facts do not warrant the conclusion that any of its capital stock was employed within this state. It kept no property for sale within this state. The samples were not merchantable, and were of such trifling value that, like its office furniture, it cannot fairly be considered as capital employed within this state. People v. Campbell, 139 N. Y. 68, 73, 34 N. E. 753. The exhibiting of samples and the taking of orders from purchasers within this state, which were sent for approval to the treasurer, does not even constitute a sale within this state; but, if it did, such sales were no part of the capital stock of the company. The decision in the Seth Thomas Clock Case, 133 N. Y. 323, 328, 31 N. E. 238, has settled that question against the comptroller.

As to the bank account, it was the product of moneys sent monthly by the company to its agent, to pay its monthly expenses. Such remittances were placed by him in bank, and checks drawn against it, as a convenient method of making the payments for which it was especially designed. It appears, therefore, that the relator had constantly on hand a monthly average of about $500, sent for the express purpose of paying certain debts which accrued monthly, and that at all times such unpaid debts exceeded the amount on hand. Such remittances may have represented capital stock, and they may have been derived from the monthly earnings of the company, and represented surplus. The treasurer swears, in his affidavit presented to the comptroller on the ap-

plication for a reassessment, that all the capital stock is employed in manufacturing in the state of Massachusetts. But if we treat it as capital, on the theory that it must be so considered unless the company presents facts to the comptroller showing that it was derived from surplus, nevertheless it cannot fairly be said to be capital employed within this state. To be employed within this state, the property, whether money or goods, representing the capital, should be kept on hand in this state for use in the general business of the company, and it is its actual value only ' that is subject to taxation. The reasoning in the Seth Thomas Clock Case, above cited, and the purpose of the act under consideration, indicate that such is the rule. A sum of money sent into this state from the home office for the express purpose of paying a debt incurred herein, whether for services rendered or materials furnished, cannot reasonably be considered capital employed within this state. We may, I think, safely conclude that it was not the intent to levy a tax on all purchases made by a foreign corporation within this state. For the same reason, remittances sent to the company's agent to pay the company's creditors within this state, for debts then due and owing them, is not capital liable to taxation. Such remittance is, in effect, appropriated to the payment of certain debts, and is here for that purpose only. But for the existence of such indebtedness it would not have been in this state, and it is applied to the payment thereof as soon as it reasonably can be. The indebtedness always equals the remittance, and thus no capital is left for the use of the company. Remittances of that character, and for such purposes, we conclude, should not be treated as capital employed within this state. As to the fact that the relator had an interest, as lessee, in a building for which it paid rent, such an interest was not considered as capital taxable within this state in the case of People v. Campbell, 139 N. Y. 68, 72, 34 N. E. 753. Upon the record before us, it does not appear that the relator had any capital stock employed within this state, and therefore the determination of the comptroller should be reversed.

Determination of the comptroller reversed, with $50 costs and disbursements. All concur.